7 W    64
22 SC ⁸476

## Mylin's Estate.

The orphan's court has power to adopt rules to regulate its own practice; and a rule, that no exception to a report of auditors shall be received, unless the same be filed within ten days, is valid; and the supreme court will not take notice of any exception which was not filed in the court below, according to the rules of that court.

Although an executor, administrator or guardian, may be examined on oath by the orphan's court, or auditors, touching the settlement of his account, yet such examination must be at the instance of the opposing party: he is not entitled to give evidence at his own instance, and in his own behalf.

The rules of evidence are as applicable to proceedings of the orphan's court, as of any other court.

APPEAL from the decree of the orphan's court of *Lancaster* county, upon the settlement of the administration account of Martin Mylin, Abraham Mylin, and Jacob Mylin, executors of John Mylin deceased, by Christian Mylin, one of the legatees.    The facts of the case, necessary to an understanding of the questions settled, are sufficiently stated in the opinion of the court.

*Norris*, for appellant.
*Reigart* and *Ellmaker*, contra.

The opinion of the Court was delivered by

Rogers, J.—Christian Mylin, one of the sons of the testator, filed exceptions to the administration account, and the orphan's court appointed auditors to settle and adjust their estate.    The auditors made report the 6th of October 1837, and on the same day the accountants filed their exceptions.    The 28th March 1838, Christian Mylin also filed exceptions.    Christian Mylin appeals from the decree of the orphan's court, and now relies on the exceptions filed by him in the orphan's court, and also alleges, that there was error in the decree of the court, on the exceptions filed by the accountants.

We will dispose, in the first place, of the exceptions, which were filed by Christian Mylin.    The question depends on the validity of a rule of the orphan's court, which requires, that all reports of auditors shall be returnable to the next regularly assigned orphan's court; and no exceptions to such reports of auditors shall be received, unless the same be filed within ten days after the report shall be read in

[Mylin's Estate.]

open court. It is admitted, that the exceptions were not filed, within the period allowed by the rule. The expediency of the rule is not a question for this court; for it must be left to the sound discretion of every court, to regulate its own practice. The general, inherent power of all courts, to regulate their own practice, without control, on the ground of expediency, is recognized to its fullest extent in Varalli *v.* Anderson, 3 *Binn.* 417. It is an incontestable principle, that every court has, by its constitution as a court, the right to make rules for the regulation of the practice. By the act of the 16th June 1836, it is provided, that the orphan's court, in common with other courts, shall have full power and authority to establish such rules, for regulating the practice, as in their discretion they shall judge necessary or proper; provided, such rules shall not be inconsistent with the constitution and laws of this commonwealth. This act introduces no new principle; it is confirmatory of the law, as it stood before its passage. But it is contended, that the rule is inconsistent with the act allowing three years for an appeal; also, with the fourth section of the act of the 14th of April 1835, and the second section of the act of the 16th of June 1836. The party has a right to appeal, at any time, within three years, nor does the rule interfere with that right, although the effect may be, to put limits to the matters of inquiry on the appeal. And this is the same principle which is constantly applied in writs of error. A party has a right to a writ of error, within seven years; but the proceedings will not be reversed, unless the error appears on the record, and has been the subject of exception in the court below. Besides, if the first ground taken be sustained, it virtually takes from the orphan's court all power to regulate the practice, as regards this matter; for the argument goes the whole length of the position, that the parties have three years to file their exceptions to the administration account, on the report of the auditors. We cannot suppose it was the intention of the legislature to restore the practice which obtained before the act of 1832; but this would be the inevitable effect of the doctrine contended for. Before that act, on an appeal, the accounts were examined *de novo*, and this practice produced much inconvenience and injustice, which was remedied by this act, and the construction given to it. If that had been the design, it is presumed that such apt words would have been used, as would clearly indicate the intention of the legislature. No injustice can arise from the rule, except it be produced by the culpable negligence of the parties interested in the estate. The legislature has made it necessary to give notice to the heirs and legatees, in a manner prescribed, and which, in almost every instance, has the desired effect. But if a fair notice has not been received (which in some instances may be the case), the orphan's court may, in their discretion, afford an adequate relief, by permitting the party aggrieved to file exceptions, *nunc pro tunc.* It is not alleged that Christian Mylin had no notice; nor has any reason been assigned for omitting to file his exceptions in due time. The pre-

[Mylin's Estate.]

sumption is, that he was satisfied with the report of the auditors. There would, therefore, be no ground, even if application was made, to permit him, after having slipped the time allowed by the rule, *now* to file his exception.

In all cases of appeal from the definitive sentence or decree of the orphan's court, the supreme court, by the act of the 14th of April 1835, have power to hear and determine the same, as to whom right and justice may belong, and refer the same to auditors, as they may think proper. A construction to this act was given in Heis's Appeal, 5 *Watts* 157. It was held, that it was a general rule, that a decree will not be reversed, but on an exception filed in the court from which the appeal is taken. That the intention of the legislature was, to vest in the supreme court a discretionary power, to refer the accounts to auditors for further investigation, when it is apparent *injustice* has been done. By the act of the 16th of June 1836, second section, the supreme court, in all cases of appeal from the orphan's court, have power to hear, try, and determine the merits of such cases, and decree according to justice and equity. By this, we do not understand that the court is vested with any new power, for the court were bound to do justice before ; and the rules adopted were intended to produce that effect. Under the act of 1835, some doubts existed, whether the court were bound to refer the accounts to auditors, or whether the court itself could correct the mistake, when it was apparent injustice had been done. We are of opinion, that the rule recognized in Heis's Appeal has not been altered by this act, and this court cannot interfere, unless in the case of a plain and palpable violation of the rules of equity and justice. A strict adherence to this rule will best protect the interest of persons interested in the estates of decedents, as well as administrators and executors.

This disposes of the exceptions filed by Christian Mylin, and it remains now to examine the decree of the court, on exceptions by the executors.

The appellant complains of the decree of the court in relation to two items, viz., the allowance of 1400 dollars paid by Abraham Mylin, in part payment of the land devised to him by the will, and 340 dollars and 23 cents, which Jacob Mylin alleges he paid on account of the valuation money of the tract of land devised to him. The administration account was referred to auditors, who reported a balance in favour of Christian Mylin, of 4943 dollars 28 cents. The auditors charge the accountants with the whole amount of the valuation money of the several tracts of land devised to the executors, viz., Martin, 10,000 dollars, Abraham, 9,600 dollars, and Jacob Mylin, 11,470 dollars. To this report the accountants filed exceptions, in due time, alleging, that Martin had, in the lifetime of the testator, paid to him, on account of the land devised to him, 2000 dollars ; that Abraham had paid 1600 dollars, and that Jacob, in like manner, had paid 3470 dollars. In support of the payments, the depositions of the accountants and devisee were read in evidence ; and the first

question is, whether this is competent testimony. We think it clear, the evidence could not be used for the purpose of discharging themselves, either upon the principle of the common law, or the acts of the legislature.   By filing a joint account, and this report of the auditors, they were jointly liable for the whole amount of the valuation money, and the effect of this evidence would be, to discharge themselves from their liability.   They have, therefore, a direct pecuniary interest in the controversy, which furnishes a conclusive objection to the competency of their testimony.   This would certainly be so in a court of common law ; nor can the orphan's court disregard the rules of evidence ; they are as much bound by those rules as a court of chancery or a court of common law.   It is said, that if issues had been directed to try whether those payments were made, the devisees would have been competent witnesses for each other. But I do not perceive how this would have altered the rules of evidence.   The objects of the issues would be to ascertain the fact of payment by a jury, instead of the court determining the fact themselves.   After, however, the fact was found, whether by the court or a jury, the charge would be a just charge against all the accountants ; so that the objection on the ground of interest, would be the same, whatever mode of trial had been adopted.   But reliance is placed on the fifty-sixth section of the act of the 29th March 1832 ; which declares that the orphan's court, or any auditors appointed by them, shall have power, on oath or affirmation, to examine any of the parties to any proceeding instituted in such court.   They may also compel the production of any books, papers, or other documents, necessary to a just decision of the question before them, or before auditors.   The language of the act is very comprehensive, and well adapted to the purpose for which it was intended, viz., to enable the court to do justice, by an examination, at the instance of the opposite party, of the accountants, as to the disposition of the assets, and the management of the estate, and to compel the production of such books and papers, in the possession of either party, as may conduce to an elucidation of the matters in controversy.   The legislature has conferred upon the orphan's court, a power undeniably exercised by a court of chancery ; but they certainly did not intend to alter all the rules of evidence, heretofore considered sacred in courts of law or equity, by the introduction of the mischievous and pernicious principle, of enabling a party in interest to give evidence in his own cause.   The right of examination is not confined, by the act, to the accountants, but it is extended expressly to any of the parties to the proceedings.   It cannot be supposed that any of the parties may be witnesses in their own favour, as a matter of course, when the proceedings are in the orphan's court, which, in ordinary cases, is as much bound by the rules of evidence, as the courts of common law.   In Bowman *v.* Herr, 1 *Penns. Rep.* 283, it is said, cases may arise where the orphan's court *may*, in the exercise of a reasonable discretion, supply the want of a regular voucher, by the oath of

a guardian, or administrator ; but it must be done with great caution. It is a kind of evidence on which little reliance should be placed ; it should be resorted to with great delicacy ; and even then, should be sustained by some corroborating proof. In Bowman *v.* Herr, the court spoke of exceptions, rather than a rule, and certainly had no intention to intimate an opinion that the examination of the account-ants could be resorted to for the purpose of discharging themselves from liability, in a case such as is here presented. In the investi-gation of this case, we shall throw out of view the testimony of the accountants, and shall confine ourselves to the other evidence which has been adduced.

We have had some difficulty as to the payment of 1400 dollars by Abraham Mylin. This was allowed by the orphan's court, on the tes-timony of John Mylin, in connection with the receipts ; and we cannot say the court was wrong. There were three receipts to Abraham : one for 600 dollars, signed by John Mylin, the father ; the other two, viz., for 450 dollars and 350 dollars, were signed by John Mylin, the son. It is not stated on the face of the first receipt, for what purpose, or on what account the 600 dollars was paid ; in the two last it is said to have been on account of the witness's portion in the land. In explanation of these receipts, John Mylin was exam-ined as a witness by the accountants. He proves that the receipt for 600 dollars is in the handwriting of his father, John Mylin ; that the other receipts were signed by himself; and that all the money, including the 600 dollars, was paid to him by Abraham, with the assent of his father, as part of his portion. In opposition to this evidence, the exceptants rely on the will, which was executed after the alleged payments. The testator values the premises devised to Abraham, at the sum of 9,600 dollars, which he orders and directs to be paid in one year after his decease. By the acceptance of the devise, it is contended that Abraham is bound to pay the whole amount of the valuation, without any deduction whatever, and with-out regard to payments made before the execution of the will. In this view of the case, it must be admitted, there is great force ; but as there is some evidence that there was a former will in existence at the time, of which this is a copy, differing merely in the restric-tions put on Christian, and as John Mylin proves the money was paid on account of the land, the court has come to the conclusion to allow the accountants that amount. This part of the decree of the orphan's court is affirmed.

The allowance of 3470 dollars, alleged to have been paid by Jacob Mylin, to his father, on account of the land devised, stands on a dif-ferent footing from the 1400 dollars allowed to Abraham Mylin. John Mylin, the only competent witness, knows nothing of this payment. It rests entirely on the receipt itself, and the testimony of Jacob Mylin himself. The receipt is as follows. " Received, April 6, 1820, of my son, Jacob Mylin, 3404 dollars and 23 cents, on account, and in part

[Mylin's Estate.]

of the valuation, or appraisement money, of a tract of land which I have devised to him, in my last will and testament."

" *Test,* W. B. Ross.

" $ 3404, 23."

The receipt is in the handwriting of the witness, by whom it is attested ; but the name of John Mylin is cut out from the paper, and it appears in that cancelled state.  It is not certain, although it is probable, from the face of the paper, that the receipt was signed by John Mylin.   The receipt, as is said by Jacob Mylin, was given for the share, he, Jacob Mylin, had to pay his father on the land.   He says he paid the money to him in Bird Ross's office, who wrote the receipt, and that his father signed it.   That he cut the name out of the receipt himself.   That as the money was paid, he cut the name out, after his father's death, a long time after it was paid, as he would out of any other bond.   This is the account he gives of it. It is contended, that although Jacob cannot be examined, to discharge himself from the payment of the money which the auditors have charged against him, yet, that it is competent for him to prove by his oath, and at his own instance, the state of the paper offered in evidence, when he found it, and where he found it ; and for this position they rely on Lenox *v.* The Executor of Dehon, 1 *Yeates* 37 ; and Stanley *v.* The Executors of Everhart, 1 *Yeates* 256.   In the cases cited, the papers belonged to the estate of the testator, and the executors were admitted, from necessity, to prove the collateral point before the court, to introduce testimony of the contents of the papers to the jury.   Here the receipt was the paper of the witness, cancelled by himself, for some reason, which it is difficult to conjecture, and which has not, and perhaps cannot be explained.   We are at a loss to know why the receipt was cancelled ; for it is difficult to imagine any similarity between a receipt and a bond, which could induce a rational person to cancel it, and then destroy that which was taken for his own security.   It would be a dangerous precedent, when the spoliation of a paper has been confessedly made by a party himself, to permit him, by a proof of that fact, to lay a foundation for the secondary proof of its contents.   The court will not loose the fetters which the party has put upon himself, but he must lie dumb (admitting the fact to be as he states it) under his own folly.   The smallest alteration or erasure, in a written instrument, if made without the consent of the other party, vitiates it.   The rule is necessary to insure the identity of the instrument ; to prevent the substitution of one instrument for another, and prevent tampering with written instruments.   Stephens *v.* Graham et al., 7 *Serg. & Rawle* 505.   A party may be permitted, by his own oath, from necessity, in some cases, to show that a bond, or other instrument of writing, has been destroyed or mutilated by accident, or carelessness, so as to introduce proof of its contents ; but no case has been cited, where the alteration, or erasure, has been designedly made by the party himself, and proof of its contents has been suffered to be laid before the jury.   As

VII.—G

[Mylin's Estate.]

there is no proof of this payment, we are of opinion that this item of the decree should be reversed, and that the accountants should be charged with that amount. We are by no means satisfied with the reason assigned for cancelling the receipt. If we were to indulge in conjecture, the circumstances of the case would induce a belief that some arrangement took place between the father and son ; that the receipt was cancelled by the father, and that it was found in that state among the papers of the testator by the executors. But be this as it may, we think the accountants are not entitled to this credit.

The exceptant also claims, in this account, to charge the executors with the additional sum of 1500 dollars, and with the arrearages of interest. It is very clear that that amount which arose from the sale of Christian Mylin's estate, by his assignees, went into the lands of John Mylin ; but the difficulty is, whether the executors are accountable, or whether it should be charged against Martin and Abraham Mylin, as assignees of Christian. The object of the arrangement, which, we may presume, was made with the assent of Christian, appears to have been, to save that much of his estate for his benefit, and the benefit of his children. It is not the case of a voluntary bond, as was erroneously supposed ; but the money was received by the father from the assignees, to save it for Christian. That this was the nature of the arrangement, appears as well from the statements of the executors, as the fact, which is admitted, that the interest on that amount was paid, before and after the death of John Mylin the father, to Christian, and on his account, in payment of the dower, which was a lien on his land. The estate, therefore, became indebted to Christian to that amount, which, together with the interest, which remains unpaid, he is justly entitled to.

In addition to the exceptions, the counsel for Christian Mylin prayed the court, when making up their opinion on the merits of the cause, to pass upon several legal propositions which were filed, and to affirm, or disaffirm the same. Whether the orphan's court were right or wrong, in their answers to these points, I shall not attempt to decide, for all we are called upon to examine, is, whether the decree is right, without regard to the reasons of the court in coming to that conclusion. The course adopted is a novel and most extraordinary one, which we hope may not be repeated, as it is calculated to perplex and harass the court, without tending, in the slightest degree, to affect the merits of the case.